**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RICHARD M. GILMAN, JAMES
MASONER, RICHARD W. BROWN,
CHRIS FOWLER, EDWARD STEWART,
MARIO MARQUEZ, RICHARD LEWIS,
and GLORIA OLSON,
              *Plaintiffs-Appellees,*

        v.

ARNOLD SCHWARZENEGGER,
Governor of California; ROBERT
DOYLE, Chairman of the Board of
Parole Hearings; ALL
COMMISSIONERS OF THE BOARD OF
PAROLE HEARINGS; ALL DEPUTY
COMMISSIONERS OF THE BOARD OF
PAROLE HEARINGS WHO HEAR LIFER
CASES,
              *Defendants-Appellants.*

No. 10-15471

D.C. No.
2:05-cv-00830-
LKK-GGH

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior District Judge, Presiding

Argued and Submitted
August 12, 2010—San Francisco, California

Filed December 6, 2010
Amended January 24, 2011

Before: Susan P. Graber, Consuelo M. Callahan, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

1339

## COUNSEL

Terence J. Cassidy, Michael W. Pott (argued), and Thomas L. Riordan, Porter Scott, Sacramento, California, for the defendants-appellants.

Daniel J. Broderick, Federal Defender, and David Porter and Monica Knox (argued), Assistant Federal Defenders, Sacramento, California, for the plaintiffs-appellees.

## ORDER

The opinion filed on December 6, 2010 is hereby amended. No petition for panel rehearing or petition for rehearing en banc may be filed.

## OPINION

BEA, Circuit Judge:

Plaintiffs are eight California life-term prisoners who represent a class of similarly situated California prisoners. They allege that Proposition 9, the "Victims' Bill of Rights Act of 2008: Marsy's Law," which modifies the availability and frequency of parole hearings, violates the *Ex Post Facto* Clause of the United States Constitution. The district court held that Plaintiffs were likely to succeed on the merits of their claim.

We hold that the district court abused its discretion and, therefore, reverse.

### The California Prison Parole Scheme

The California Board of Parole Hearings ("Board") has "the power to allow prisoners imprisoned in the state prisons . . . to go upon parole outside the prison walls and enclosures." Cal. Penal Code § 3040 (2010). California prisoners who are serving sentences of life with the possibility of parole are not eligible for parole until they have served the greater of a term of seven years or "[a] term as established pursuant to any other provision of law that establishes a minimum term or minimum period of confinement." *Id.* § 3046(a).

The Board is required to conduct a prisoner's first parole hearing one year prior to the prisoner's minimum eligible parole release date. *Id.* § 3041(a). At the hearing, a panel—two or more commissioners or deputy commissioners of the Board—must first determine whether the prisoner is "suitable" for parole. *See id.* § 3041(b). The panel must find a prisoner suitable for parole and set a parole date

> unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

*Id.* The panel's "fundamental consideration in parole decisions is public safety." *In re Lawrence*, 190 P.3d 535, 549 (Cal. 2008). "[T]he core determination of 'public safety' . . . involves an assessment of an inmate's *current* dangerousness." *Id.*[1] The Governor may review and affirm, modify, or

---

[1]In California, "some evidence" of future dangerousness is required to deny parole. *Hayward v. Marshall*, 603 F.3d 546, 562 (9th Cir. 2010) (en banc).

reverse a panel's suitability determination. Cal. Const. art. V, § 8(b); Cal. Penal Code § 3041.2. But, the Governor's review must be based on the same factors the Board is required to consider. Cal. Const. art. V, § 8(b).

If the panel determines that the prisoner is unsuitable for parole at the time of the hearing, the panel must set the date for the prisoner's next parole hearing. Cal. Penal Code § 3041.5(a)(6). At the next hearing, a panel determines whether intervening changes have rendered the prisoner suitable for parole. *Id.* § 3041.5(c).

*The Deferral Process Before and After Proposition 9*

Before Proposition 9 was enacted, the length of the deferral was determined by California Penal Code § 3041.5(b)(2). That section provided:

> The board shall hear each case *annually* . . . , except the board may schedule the next hearing no later than the following:
>
> > (A) *Two years* after any hearing at which parole is denied if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding.
> >
> > (B) Up to *five years* after any hearing at which parole is denied if the prisoner has been convicted of murder, and the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding in writing.

Cal. Penal Code § 3041.5(b)(2) (2008) (emphasis added). In 2007, 35% of prisoners who were denied parole received

deferrals of one year, 32% received deferrals of two years, and 33% received deferrals of three years or more. In 2008, these percentages were 40, 33, and 27, respectively.[2]

Proposition 9 significantly changed the law governing deferral periods.[3] The relevant changes were codified in California Penal Code § 3041.5(b)(3) and provide:

> The board shall schedule the next hearing, after considering the views and interests of the victim, as follows:
>
> > (A) *Fifteen years* after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that the criteria relevant to the setting of parole release dates enumerated in subdivision (a) of Section 3041 are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than 10 additional years.
> >
> > (B) *Ten years* after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that the criteria relevant to the setting of parole release dates enumerated in subdivision (a) of Section 3041 are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than seven additional years.

---

[2]The 2008 statistics do not include data from parole hearings conducted after December 10, when Proposition 9 was implemented.

[3]No changes were made to the basis for determining suitability or the Governor's role in the parole process.

> (C) *Three years*, *five years*, or *seven years* after any hearing at which parole is denied, because the criteria relevant to the setting of parole release dates enumerated in subdivision (a) of Section 3041 are such that consideration of the public and victim's safety requires a more lengthy period of incarceration for the prisoner, but does not require a more lengthy period of incarceration for the prisoner than seven additional years.

Cal. Penal Code § 3041.5(b)(3) (2010) (emphasis added).

The most significant changes are as follows: the minimum deferral period is increased from one year to three years, the maximum deferral period is increased from five years to fifteen years, and the default deferral period is changed from one year to fifteen years. *See id.* Further, the burden to impose a deferral period other than the default period increased. Before Proposition 9 was enacted, the deferral period was one year unless the Board found it was *unreasonable* to expect the prisoner would become suitable for parole within one year. Cal. Penal Code § 3041.5(b)(2) (2008). After Proposition 9, the deferral period is fifteen years unless the Board finds by *clear and convincing* evidence that the prisoner will be suitable for parole in ten years, in which case the deferral period is ten years. Cal. Penal Code § 3041.5(b)(3)(A)-(B) (2010). If the Board finds by clear and convincing evidence that the prisoner will be suitable for parole in seven years, the Board has discretion to set a three-, five-, or seven-year deferral period. *Id.* § 3041.5(b)(3)(B)-(C).

Proposition 9 also amended the law governing parole deferral periods by authorizing the Board to advance a hearing date. The Board may exercise its discretion to hold an advance hearing *sua sponte* or at the request of a prisoner. "The board may in its discretion . . . advance a hearing . . .

to an earlier date, when a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration of the prisoner . . . ." *Id.* § 3041.5(b)(4). Also, a prisoner may request an advance hearing by submitting a written request that "set[s] forth the change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration." *Id.* § 3041.5(d)(1). A prisoner is limited to one such request every three years. *Id.* § 3041.5(d)(3). Although the minimum deferral period is three years, there is *no* minimum period the Board must wait before it holds an advance hearing. *See id.* § 3041.5(b)(4).

Plaintiffs filed suit against the state in federal court under 42 U.S.C. § 1983. The only claim relevant to this appeal is Plaintiffs' claim that Proposition 9 violated their rights under the *Ex Post Facto* Clause of the United States Constitution. Plaintiffs filed a motion for a preliminary injunction to prevent the Board from enforcing Proposition 9's amended deferral periods.[4] On February 4, 2010, the district court granted Plaintiffs' motion for a preliminary injunction. On March 3, 2010, the state timely appealed. On April 7, 2010, the district court entered an order staying the preliminary injunction solely as to Plaintiff Gilman.

## I

**[1]** "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

---

[4]Because class certification was on appeal, the motion for preliminary injunction was evaluated and granted only as to the named Plaintiffs. The district court's order which certified the class was subsequently affirmed on appeal.

injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008). "A preliminary injunction is an 'extraordinary and drastic remedy'; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted).

This court reviews for an abuse of discretion a district court's decision to grant or deny a preliminary injunction. *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 651 (9th Cir. 2009). A two-part test is used to determine whether the district court abused its discretion. *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc). First, this court must "determine de novo whether the [district] court identified the correct legal rule to apply to the relief requested." *Id.* at 1262. A district court necessarily abused its discretion if it applied the incorrect legal standard. *Id.* at 1261. Second, if the district court applied the correct legal standard, this court will reverse only when "the [district] court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* at 1262 (internal quotation marks omitted).

II

**[2]** "The States are prohibited from enacting an *ex post facto* law." *Garner v. Jones*, 529 U.S. 244, 249 (2000) (citing U.S. Const. art. I, § 10, cl. 1).[5] "One function of the *Ex Post Facto* Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission." *Id.* Although retroactive changes in laws governing parole of inmates *may* violate the *Ex Post Facto* Clause, "not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited." *Id.* at 250. A retroactive procedural change violates the

---

[5]The *Ex Post Facto* Clause applies to the states directly: "No State shall . . . pass any . . . ex post facto Law . . . ." U.S. Const. art. I, § 10, cl. 1.

*Ex Post Facto* Clause when it "creates a *significant risk* of prolonging [an inmate's] incarceration." *Id.* at 251 (emphasis added). A "speculative" or "attenuated" risk of prolonging incarceration is insufficient to establish a violation of the *Ex Post Facto* Clause. *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 509 (1995). Thus, Plaintiffs cannot succeed on the merits of their *ex post facto* claim unless (1) Proposition 9, on its face, created a significant risk of increasing the punishment of California life-term inmates, or (2) Plaintiffs can "demonstrate, by evidence drawn from [Proposition 9's] practical implementation . . . , that its retroactive application will result in a longer period of incarceration than under the [prior law]." *Garner*, 529 U.S. at 255.

In *Morales*, the Supreme Court upheld the constitutionality of a statutory change to the laws that governed California parole hearings. 514 U.S. at 501-02. There, the California legislature decreased the frequency of parole hearings for inmates convicted of multiple murders—from every year to up to every three years. *Id.* at 503. The Court explained the amendment did not increase the statutory punishment for any particular offense, did not change the date of inmates' initial parole hearings, and did not change the standard by which the Board determined whether inmates were suitable for parole. *Id.* at 507. The amendment simply "introduced the possibility that after the initial parole hearing, the Board would not have to hold another hearing the very next year, or the year after that, if it found no reasonable probability that respondent would be deemed suitable for parole in the interim period." *Id.* This change did not violate the *Ex Post Facto* Clause because it did not "produce[ ] a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.* at 509. The change "applie[d] only to a class of prisoners[, murderers of multiple victims,] for whom the likelihood of release on parole [was] quite remote," *id.* at 510; the frequency of an inmate's hearings was not affected unless the Board concluded " 'it [was] not reasonable to expect that parole would be granted at a hearing during the following

years,' " *id.* at 511 (quoting Cal. Penal Code § 3041.5(b)(2) (1982)); and the Board retained the authority to schedule annual hearings, *id.* Thus, the decrease in the frequency of parole hearings "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes." *Id.* at 509. Further, inmates who received two- or three-year deferrals were not prohibited from requesting advance hearings based on changed circumstances that affected their suitability for parole. *Id.* at 512.

In *Garner*, the Georgia Board of Pardons ("Board") changed the frequency of parole hearings from every three years to up to every eight years for inmates serving life sentences. 529 U.S. at 247. Jones, who was serving two life sentences for murder, was denied parole at his first parole hearing. *Id.* The Board scheduled his next parole hearing for eight years later. *Id.* Jones sued the Board in federal court under 42 U.S.C. § 1983 and alleged the Board's amendment violated the *Ex Post Facto* Clause. *Id.* at 248. The district court granted summary judgment to the Board. *Id.* The Eleventh Circuit reversed because the amendment " 'seem[ed] certain' to result in some prisoners serving extended periods of incarceration." *Id.* at 255. The Eleventh Circuit distinguished the case from *Morales* because the change made by the Georgia Board (1) applied to a broader class of inmates (i.e., all life-term inmates), some of whom could expect to be paroled at some point; (2) allowed the Board to delay subsequent hearings for up to eight years, instead of three years; and (3) did not require the Board to state the bases for finding there was no reasonable probability the inmate would become suitable for parole before the next hearing. *Id.* at 249.

The Supreme Court reversed and remanded. *Id.* at 257. The Court rejected Jones's contention that the amendment eliminated the Board's exercise of discretion between scheduled parole hearings on the basis that the changes to the frequency of parole hearings were "qualified in two important respects."

*Id.* at 254. "First, the law vests the Parole Board with discretion as to how often to set an inmate's date for reconsideration, with eight years for the maximum." *Id.* The Board's policy provides that it will set the duration between parole hearings at more than three years only if "it is not reasonable to expect that parole would be granted during the intervening years." *Id.* "Second, the Board's policies permit expedited parole reviews in the event of a change in [an inmate's] circumstance or where the Board receives new information that would warrant a sooner review." *Id.* (internal quotation marks omitted). The Court concluded that the amendment "[did] not by its own terms show a significant risk [of increasing Jones's punishment]." *Id.* at 255. Thus, Jones was required to "demonstrate, by evidence drawn from the rule's practical implementation by the [Board], that its retroactive application will result in a longer period of incarceration than under the earlier rule." *Id.* Because there was insufficient evidence in the record to determine whether the amendment "created a significant risk of increased punishment for [Jones]," the Court remanded the case. *Id.* at 257.

**[3]** Here, as in *Morales* and *Garner*, Proposition 9 did not increase the statutory punishment for any particular offense, did not change the date of inmates' initial parole hearings, and did not change the standard by which the Board determined whether inmates were suitable for parole. However, the changes to the frequency of parole hearings here are more extensive than the change in either *Morales* or *Garner*. First, Proposition 9 increased the maximum deferral period from five years to fifteen years. This change is similar to the change in *Morales* (i.e., tripled from one year to three years) and the change in *Garner* (i.e., from three years to eight years). Second, Proposition 9 increased the minimum deferral period from one year to three years. Third, Proposition 9 changed the default deferral period from one year to fifteen years. Fourth, Proposition 9 altered the burden to impose a deferral period other than the default period. Before Proposition 9, the deferral period was one year unless the Board

found it was unreasonable to expect the prisoner would be suitable for parole in one year. After Proposition 9, the deferral period is fifteen years unless the Board finds by clear and convincing evidence that the prisoner will be suitable for parole in ten years, in which case the deferral period is ten years. If the Board finds by clear and convincing evidence that the prisoner will be suitable for parole in seven years, the Board has discretion to set the deferral period at three, five, or seven years. Neither *Morales* nor *Garner* involved a change to the minimum deferral period, the default deferral period, or the burden to impose a deferral period other than the default period.

**[4]** In both *Morales* and *Garner*, even after the changes to the laws governing the frequency of parole hearings, the Board retained discretion to set subsequent parole hearings at the same frequency as it would have before the changes to the law. But here, Proposition 9 eliminated the Board's discretion to set a one-year deferral period, even if the Board were to find by clear and convincing evidence that a prisoner would be suitable for parole in one year. In the two years before Proposition 9 was implemented, approximately two-thirds of prisoners received deferral periods of one or two years. Now, *all* prisoners will receive deferral periods of at least three years. Further, the Board must set a fifteen-year deferral period unless it finds by clear and convincing evidence that the prisoner will be suitable for parole in ten years or less. Thus, the changes required by Proposition 9 appear to "create[ ] a significant risk of prolonging [Plaintiffs'] incarceration." *Garner*, 529 U.S. at 251.[6]

---

[6]This conclusion, however, assumes that more frequent parole hearings produce more frequent *grants* of parole, rather than more frequent *denials* of parole. It is true that more frequent hearings give a prisoner earlier *opportunities* at being paroled; however, Plaintiffs produced no evidence to support a finding that more frequent parole hearings result in more frequent grants of parole. Indeed, the assumption that more frequent parole hearings produce more frequent grants of parole is belied by the situations of several of the named Plaintiffs in this case, who were subject to *repeated* one- and two-year deferrals. These prisoners would not have served shorter prison terms just because of more frequent parole hearings.

Even assuming, without deciding, that the statutory changes decreasing the frequency of scheduled hearings would create a risk of prolonged incarceration, the availability of advance hearings is relevant to whether the changes in the frequency of parole hearings create a significant risk that prisoners will receive a greater punishment. *Garner*, 529 U.S. at 256-57;[7] *Morales*, 514 U.S. at 512. In *Morales*, the prisoner contended "there [was] some chance that the amendment might . . . produce an increased term of confinement for some prisoners who might experience a change of circumstances that could render them suitable for parole during the period between their hearings." 514 U.S. at 512. The Court rejected this contention and explained that, even if it assumed such a change of circumstances, "there is no reason to conclude that the amendment will have any effect on any prisoner's actual term of confinement, for the current record provides no basis for concluding that a prisoner who experiences a drastic change of circumstances would be precluded from seeking an expedited hearing from the Board." *Id.* Even though such expedited hearings were not provided by statute or regulation, the Court relied on the Board's "practice" of "review[ing] for merit any communication from an inmate asking for an earlier suitability hearing." *Id.* As the Court explained, "[a]n expedited hearing by the Board . . . would *remove any possibility of harm*" to prisoners who experienced changes in circumstances between hearings. *Id.* at 513 (emphasis added).

---

[7]In *Garner*, the Board adopted a policy that permitted inmates, "upon a showing of a change in their circumstance or where the Board receives new information, to receive expedited reconsideration for parole." 529 U.S. at 248 (citation and internal quotation marks omitted). The Court held that the Board's internal policy statement was relevant to whether changes to the frequency of parole hearings violated the *Ex Post Facto* Clause. *Id.* at 256. As the Court explained, "policy statements, along with the Board's actual practices, provide important instruction as to how the Board interprets its enabling statute and regulations, and therefore whether, as a matter of fact, the amendment to [the Board's rules] created a significant risk of increased punishment." *Id.* "Absent a demonstration to the contrary, [courts must] presume the Board follows its statutory commands and internal policies in fulfilling its obligations." *Id.*

**[5]** Here, advance hearings are explicitly made available by statute: "The board may in its discretion . . . advance a hearing . . . to an earlier date, when a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration of the prisoner." Cal. Penal Code § 3041.5(b)(4). The Board may exercise its discretion to hold an advance hearing *sua sponte* or at the request of a prisoner. A prisoner may request an advance hearing by submitting a written request that "set[s] forth the change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration." *Id.* § 3041.5(d)(1). The Board's decision to deny a prisoner's request for an advance hearing is subject to judicial review. *Id.* § 3041.5(d)(2). Here, as in *Morales*, an advance hearing by the Board "would remove any possibility of harm" to prisoners because they would not be required to wait a minimum of three years for a hearing. 514 U.S. at 513.

Plaintiffs provide four reasons why the advance hearings do not sufficiently reduce the risk of increased punishment for prisoners. None of these reasons is persuasive on the current record.

Plaintiffs' first reason is that the decision to grant a prisoner's request for an advance hearing is entirely discretionary. Neither a change in circumstances nor new information *requires* the Board to hold an advance hearing. However, absent evidence to the contrary, this court must presume the Board will exercise its discretion in a manner consistent with the *Ex Post Facto* Clause. *See Garner*, 529 U.S. at 256 ("Absent a demonstration to the contrary, we presume the Board follows its statutory commands and internal policies in fulfilling its obligations."). Plaintiffs have adduced no evidence that the Board has denied a request for an advance hearing where a prisoner has shown a change in circumstances or new evidence. In fact, Plaintiffs have adduced no

evidence that the Board has denied a request for an advance hearing *for any reason*. Thus, this court must presume that the Board will, upon request, schedule advance hearings for prisoners who become suitable for parole prior to their scheduled hearings.

Plaintiffs' second reason is that "there is no mechanism or procedure in place for the Board to initiate a review or to accept, consider or rule on a prisoner's request [for an advance hearing]." We are not persuaded. Section 3041.5(d)(1) allows a prisoner to request an advance hearing, and § 3041.5(b)(4) allows the Board to advance a hearing based on a change in circumstances or new information. Further, in *Morales*, no statute or regulation provided for advance hearings, yet the Court relied on the fact that the Board—the same Board involved in this case—had a practice of reviewing inmates' requests for earlier parole hearings. 514 U.S. at 512. If the Board were able to review inmates' requests for advance hearings before such hearings were explicitly authorized by statute, there is no reason to believe that the Board is no longer capable of handling such requests. Indeed, just the contrary is true now that statutory authorization has supplanted mere practice. Further, Plaintiffs have adduced no evidence that the Board has denied or failed to respond to requests for advance hearings.

**[6]** Plaintiffs' third reason is that the district court concluded that "there will necessarily be a delay between any meritorious request for an advance hearing and the grant of such hearing, and Plaintiffs contend, with some evidence, that this delay will likely exceed a year." This conclusion is not supported by the evidence in the record. Plaintiffs rely in part on the fact that the Board's decision to deny parole does not become final for four months. But Plaintiffs cite no authority that requires a prisoner to wait until the Board's decision is final before he requests an advance hearing based on changed circumstances or new information. Other steps may also delay an advance hearing once a request has been made: the Board

must solicit the views of the victim or next of kin before it grants a request for an advance hearing, Cal. Penal Code § 3041.5(b)(4), (d)(2); the Board must consider the merits of the request, *id.* § 3041.5(b)(4); and, if the Board grants the request, it must provide 90 days' notice to the victim or next of kin before it holds the hearing, *id.* § 3043(a)(1). But Plaintiffs fail to explain how these statutory requirements make it "virtually impossible" for a prisoner to receive an advance hearing within one year of the denial of parole—the previous default deferral period. The speculative and attenuated risk that an advance hearing will not be held within one year of a request is insufficient to establish an *ex post facto* violation. *See Morales*, 514 U.S. at 508-09.

Plaintiffs' fourth reason is that they will be unable to establish changed circumstances or new information with respect to static factors such as the circumstances of the commitment offense or prior criminal history. Plaintiffs are correct that those static factors will not change; but a prisoner's suitability for parole may change even though static factors remain unchanged. For example, the passage of time is a change in circumstances that may affect a prisoner's suitability for parole (i.e., the prisoner's current dangerousness) even though his prior criminal history has not changed. *See Lawrence*, 190 P.3d at 560 (holding that the passage of time is a factor the Board must consider when it determines whether a prisoner is currently dangerous and, thus, unsuitable for parole). Plaintiffs also contend that they will be unable to establish changed circumstances or new information with respect to intangible factors such as the failure to accept responsibility or the lack of sufficient remorse. But, just as a prisoner must explain his acceptance of responsibility and convey his remorse at a parole hearing, a prisoner can, in a request for an advance hearing, explain that he has accepted full responsibility for his crime and convey his remorse.

**[7]** There were no facts in the record from which the district court could infer that Proposition 9 created a significant

risk of prolonging Plaintiffs' incarceration; thus, the district court abused its discretion. *See Hinkson*, 585 F.3d at 1262 (holding that a trial court abuses its discretion when its application of the correct legal standard was "without support in inferences that may be drawn from the facts in the record"). Because on the current record Proposition 9 does not create a significant risk of prolonging Plaintiffs' incarceration on any of the theories Plaintiffs assert, Plaintiffs have not established that they are likely to succeed on the merits of their *ex post facto* claim. Therefore, we reverse the district court's order that granted Plaintiffs' motion for a preliminary injunction.

**REVERSED.**